**THATCHER ENGINEERING CORPORATION and Philipp Holzmann, AG, d/b/a Thatcher-Holzmann, a Joint Venture, Plaintiffs-Appellants**

v.

**Ralph A. BIHLMAN, John R. Bihlman, David R. Bihlman, and Mary Agnes Perryman, a partnership, d/b/a Calumet Trucking Company, Defendants-Appellees.**

No. 3–883A249.

Court of Appeals of Indiana, Third District.

Feb. 6, 1985.

Lowell E. Enslen, Gary K. Matthews, Enslen, Enslen & Matthews, Hammond, David A. Willis, Valparaiso, for plaintiffs-appellants.

Samuel J. Bernardi, Jr., Daniel A. Gioia, Robin D. Pierce, Spangler, Jennings, Spangler, & Dougherty, P.C., Merrillville, for defendants-appellees.

GARRARD, Judge.

In the spring of 1974 Northern Indiana Public Service Company (NIPSCO) was in the process of constructing the Rollin M. Schahfer Generating Station in Wheatfield, Indiana. Calumet Trucking Company (Calumet), an earth moving and excavation firm, was preparing a bid to perform dike work, including the construction of slurry cutoff walls,[1] surrounding settling basins for polluted water used in the electrical generating process. In order to prepare its bid, Calumet received pre-bid specifications and drawings prepared by Sargent & Lundy, NIPSCO's design engineers. Included in the pre-bid information were drawings completed by Sargent & Lundy indicating the results of soil borings taken by Salisbury Engineering, also hired by NIPSCO. The borings were provided by NIPSCO as information to bidders, were not part of the job specifications, and were clearly marked "FOR REFERENCE ONLY."

Calumet had no experience in constructing slurry walls and solicited bids for their construction by subcontractors. Calumet gave the subcontractors the same pre-bid information it had received from NIPSCO.

1. Slurry is a mixture of water, bentonite (a clay) and cement. Its purpose is to create an imper-

vious barrier in order to contain polluted or waste matter.

The typical method used in this country to construct slurry walls is called the "open trench method." This method consists of digging a trench, filling it with slurry and then bulldozing excavated material back into it.

In March 1974 Calumet was approached by Fred Schmednecht, the vice-president of Thatcher Engineering (Thatcher) regarding a European method for constructing slurry walls. Representatives of Calumet and Thatcher travelled to Europe to evaluate the process. A German firm, Philipp Holzmann, A.G., had experience with this method and subsequently formed with Thatcher a joint venture known as Thatcher-Holzmann.

The European method is known as the "vibrated beam method." It consists of driving a 33 inch wide steel beam into the ground by means of a vibrating hammer until it reaches a layer of impervious clay. As the beam is withdrawn, slurry is sprayed into the hole. The beam is then driven into the ground overlapping the slurry previously inserted, so that eventually a continuous sealed wall of slurry surrounds an area.

As with other subcontractors preparing bids, Thatcher-Holzmann received from Calumet the pre-bid information which included the soil boring drawings performed for NIPSCO. Based on this information, Thatcher-Holzmann submitted a bid to Calumet who then submitted its bid to NIPSCO. Calumet's bid contained alternatives for the construction of the slurry wall, i.e. NIPSCO had the option of accepting the bid with either the open trench or vibrated beam method. NIPSCO accepted Calumet's bid with the vibrated beam method contingent on construction of the slurry wall to NIPSCO's satisfaction. If the method did not work, Calumet's bid with the open trench method would be used.

On October 23, 1974 Calumet and Thatcher-Holzmann entered into a subcontract and work proceeded on construction of the slurry wall. During the spring of 1975 Thatcher-Holzmann encountered various problems constructing the slurry wall primarily due to the presence of denser soil than represented in any of the soil boring drawings. As a result, Thatcher-Holzmann replaced and upgraded various equipment and suffered lost time and increased labor costs as it attempted to perform to NIPSCO's satisfaction.

Thatcher-Holzmann brought an action seeking money damages for the breach of an oral contract for installation of a test cell, for misrepresentation of material facts used in obtaining bids, and for failure to pay under an oral modification to the written contract. After all the evidence had been presented but prior to submission of the issues to the jury, the trial court granted Calumet's motion for partial judgment on the evidence on the claim for damages stemming from erroneous soil boring drawings provided in the pre-bid package of information. The other issues were submitted to the jury which found for Thatcher-Holzmann on the issue of the test cell only and awarded damages of $15,000. After denial of its motion to correct errors, Thatcher-Holzmann brings this appeal.

*Issues:*

(1) Did the trial court err in granting the contractor's motion for judgment on the evidence?

(2) Did the trial court err in refusing to give certain instructions tendered by the plaintiff?

*Judgment on the evidence*

As we stated in *Craven v. Niagara Machine and Tool Works, Inc.* (1981), Ind. App., 417 N.E.2d 1165, 1168:

"The rule in Indiana with respect to motions for judgment on the evidence is that such a motion may be properly granted only if there is not substantial evidence or reasonable inference derived therefrom supporting an essential element of the claim: a complete failure of proof. *Ortho Pharmaceutical Corp. v. Chapman* (1979), Ind.App., [180 Ind.App. 33] 388 N.E.2d 541. Where reasonable men might differ about the evidence or where the determination of liability de-

pends upon resolving conflicting evidence, the issue is one for a jury. Therefore, a trial court may properly grant judgment on the evidence against a plaintiff only where the evidence on one or more issues is without conflict and is susceptible of only an inference in favor of the defendant. *Gilbert v. Stone City Const. Co., Inc.* (1976), 171 Ind.App. 418, 357 N.E.2d 738. Appellate review of a ruling on a motion for judgment on the evidence is subject to the same standards which govern the trial court in ruling on the motion. *Hendrickson & Sons Motor Co. v. OSHA* (1975), 165 Ind.App. 185, 331 N.E.2d 743. Therefore, this court's task is to consider the evidence most favorable to the non-moving party along with all reasonable inferences therefrom. From this evidence we must determine whether there was any evidence supporting each element which would justify submission of the claim to the jury. Indiana Rules of Procedure, Trial Rule 50. *Hendrickson, supra; Montgomery Ward & Co., Inc. v. Tackett* (1975), 163 Ind.App. 211, 323 N.E.2d 242."

Before we analyze the parties' claims, we note the relationships present here. NIPSCO is the owner of the real estate, Sargent & Lundy is the project design engineer hired by NIPSCO, Calumet is an independent contractor awarded a construction contract with NIPSCO and Thatcher-Holzmann is a subcontractor under contract to Calumet.

Thatcher-Holzmann argues that the trial court erred in granting partial judgment on the evidence because it presented evidence on each element of its claim so that based on the evidence or reasonable inferences drawn therefrom reasonable people might differ regarding the conclusion to be reached. Specifically it asserts that Calumet disclosed to it soil boring results upon which it relied as accurate in order to prepare its bid. It claims the boring results were materially erroneous, a fact which it reasonably could not have determined, and that by its reliance on the tests it sustained damages of over $513,000. It maintains the court erred in taking the issues of reasonableness and its right to rely on the soil tests away from the jury. Consequently, it claims the trial court should have denied the motion for judgment on the evidence and allowed the jury to decide its claim.

In support of its claim, Thatcher-Holzmann cites *Welsh v. Kelly-Springfield Tire Co.* (1938), 213 Ind. 188, 12 N.E.2d 254, 256 where our Supreme Court quoted from Pomeroy, *Equity Jurisprudence*, 2 Ed., Section 892 which discussed justifiable reliance upon representations made by another:

"... with respect to the question how far a party is justified in relying upon the representation made to him may be reduced to the four following cases, in the first three of which the party is not, while in the fourth he is, justified in relying upon the statements which are offered as inducements for him to enter upon certain conduct: (1) When, before entering into the contract or other transaction, he actually resorts to the proper means of ascertaining the truth and verifying the statement. (2) When, having the opportunity to make such examination, he is charged with the knowledge which he necessarily would have obtained if he had prosecuted it with diligence. (3) When the representation is concerning generalities equally within the knowledge or the means of acquiring knowledge possessed by both parties. (4) But when the representation is concerning facts of which the party making it has, or is supposed to have, knowledge, and the other party has no such advantage, and the circumstances are not those described in the first or second case, then it will be presumed that he relied upon the statement; he is justified in doing so."

Thatcher-Holzmann claims that Calumet made representations regarding the soil about which it had or should have had knowledge and Thatcher-Holzmann had none and which Thatcher-Holzmann did not attempt or have an opportunity to verify.

In support of this argument, Thatcher-Holzmann cites cases concerning disputes between property owners with special knowledge of facts and conditions making positive assertions regarding them to contractors with whom they directly deal. *Connersville Country Club v. F.N. Bunzendahl, Inc.* (1966), 140 Ind.App. 215, 222 N.E.2d 417; *Condon-Cunningham, Inc. v. Day* (1969), 22 Ohio Misc. 71, 258 N.E.2d 264; *Eastern Service Management Co. v. United States* (E.D.S.C.1965), 243 F.Supp. 302 (following *Hollerbach v. United States* (1914), 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898. We find these decisions inapposite.[2] In contrast a subcontractor is bringing this action against a contractor seeking damages resulting from reliance on soil borings prepared by agents of a non-party, the property owners. We do not believe that the evidence presented supported an essential element of the claim. There is no evidence that Calumet had special knowledge regarding the soil boring drawings.[3] It is undisputed that the drawings were prepared by design engineers based on tests performed by other engineers, both of whom were agents of NIPSCO, the owner of the property who directed that the soil tests be taken. The soil boring drawings were included in a pre-bid information package, were given to all contractors for purposes of preparing bids, were clearly marked "FOR REFERENCE ONLY," were not part of the job specifications and were not given to Thatcher-Holzmann under any contractual obligation of Calumet's to provide soil data. In addition there was no evidence presented that Calumet made any assertions regarding the soil or that they represented the soil borings as accurate or reliable. The only evidence is that Calumet passed the information to Thatcher-Holzmann.

However, Thatcher-Holzmann argues that it presented evidence which tended to show it is the custom of the industry for a subcontractor to rely upon soil boring results when determining its bid. After citation to general rules of law establishing the burden of proof, Thatcher-Holzmann states in its appellant's brief:

"The record of this case makes it clear that plaintiff has met its burden of proof. Evidence was presented and admitted at trial which tended to prove that the reliance which plaintiff claims is the custom of this industry."

No reference is made to the record which would enlighten us as to the evidence on this issue and our review of the record reveals none.

In addition, Thatcher-Holzmann maintains that both federal and Indiana courts have held that the custom of the industry is for a subcontractor to rely upon a contractor's representations. We disagree. *Eastern Service Management Co. v. United States* (E.D.S.C.1965), 243 F.Supp. 302 concerns custom in the commercial cleaning industry regarding reliance of a contractor upon specific assertions by an owner of square footage of floor space to be cleaned. In *Connersville Country Club, supra,* the owner's architect had staked out fairways and greens and prepared detailed plan specifications. Based on these, the contractor submitted a bid with a maximum price. The court then noted it is common in the building and construction industry for a contractor to rely upon sketches and stakes to base estimates of labor, machinery and time. However, the custom of reasonably relying on detailed plans and

---

**2.** Thatcher-Holzmann asserts that *Valentini v. City of Adrian* (1956), 347 Mich. 530, 79 N.W.2d 885 and *Railroad Waterproofing Corp. v. United States* (1956), 133 Ct.Cl. 911, 137 F.Supp. 713 held that when a contractor makes representations of fact of which it has special knowledge in an invitation to bid and a subcontractor who cannot verify the information by inspection relies upon it, the contractor is liable for resulting damages. In fact, both cases involve a contractor who relies upon erroneous soil information provided by a public entity which either withheld material information from bidding contractors regarding unfavorable soil conditions or made positive assertions regarding soil conditions.

**3.** The fact that Calumet had previously performed site preparation work does not, by itself, lead to a reasonable inference of special knowledge regarding sub-surface soil conditions.

stakes arranged in the open is not analogous to the circumstances here.

We find an absence of evidence and authority regarding custom in the construction trade justifying a subcontractor's reliance on a contractor for soil boring tests performed by agents of the owner. The usual claim for damages based on misrepresentations regarding sub-surface conditions is between an owner and a contractor. As noted in 37 Am.Jur.2d, *Fraud and Deceit*, Section 86, at 131–32:

> "The claim of misrepresentation as to the results of borings is probably the most frequent. But *in the absence of anything further by way of deception,* boring sheets themselves, or the results of borings as noted on plans or otherwise, if they present only the findings at the points of the borings, and not representations that the subsurface conditions in general are those so found, they are but indications from which the parties may draw inferences." (emphasis added)

As between a contractor and a subcontractor in the circumstances here, we believe that soil boring results cannot be considered anything more than mere indications and not representations of subsurface conditions absent evidence of special knowledge or some fraudulent act on the part of the contractor.

Moreover, we believe the parties intended that the soil boring drawings would be mere indications and not representations of actual subsurface conditions as revealed in their contract. The contract between Calumet and Thatcher-Holzmann incorporated by reference contract specifications in the contract between NIPSCO and Calumet which specified in Article 2 of Form 1714:

> "2. SOIL DATA AND TOPOGRAPHY
> 2.1 Soil Data: Drawings show borings made at site, and logs given thereon indicate character of soil. This information furnished for Contractor's convenience; in using it Contractor assumes the risk, as Purchaser and the Consulting Engineers assume no responsibility for accuracy of information shown thereon. Contractor will be permitted to make his own soil investigations, but same shall be made at no cost to Purchaser.
> "2.2 Topography: Drawings indicate elevations, dimensions and/or cross sections, profiles and contour lines of existing ground. This information furnished for Contractor's convenience; in using it Contractor assumes the risk, as Purchaser and the Consulting Engineers assume no responsibility for accuracy of information shown thereon. Contractor will be permitted to make his own investigation of topography during bid period, but same shall be made at no cost to Purchaser."

Finally, the evidence is without conflict that the soil borings were made in contemplation that the open trench method of constructing slurry walls would be used, a fact of which Thatcher-Holzmann was aware. There was no evidence presented that a soil test performed to determine the cost and feasibility of excavating a trench is reliable for purposes of determining the cost and feasibility of vibrating a 33 inch steel beam through soil to a depth of 11 to 15 meters. Thatcher-Holzmann purported to be experts on the vibrated beam method, a method unknown not only to Calumet but to anyone else in this country. As between these parties, if anyone had special knowledge which the other did not regarding necessary information on subsurface soil conditions in order to accurately prepare a bid, it was Thatcher-Holzmann.

Therefore, for all the reasons above, we affirm the trial court's grant of the motion for judgment on the evidence.

*Instructions*

Thatcher-Holzmann tendered to the trial court instructions numbered 1 and 3 which state:

> *"Plaintiff's Instruction No. 1*
> A modification of a written construction contract can be made orally, even though the contract provides that such modifications must be in writing; further, a modification of such a written contract can be, at times, implied from the conduct of the parties to the contract.

You are instructed that when there has been a modification of a contract, the party performing any additional work in accordance with the modification is entitled to additional compensation in an amount equal to the reasonable work and value of the additional services and work so performed (R. 213).

*"Plaintiff's Instruction No. 3*

A modification of a written contract regarding extras can be made orally, even though the contract provides that such modifications must be in writing; further, a modification of such a written contract can be, at times, implied from the conduct of the parties to the contract. (R. p. 188)."

■ Thatcher-Holzmann maintains that the trial court's instructions were confusing and misleading on the issue of oral modification of written contracts.[4] When a trial court refuses tendered instructions, on review we must determine: 1) whether the tendered instruction is a correct statement of the law; 2) whether evidence in the record supports giving the instruction; and 3) whether the substance of the tendered instruction is covered by instructions given to the jury. *Duke's GMC, Inc. v. Erskine* (1983), Ind.App., 447 N.E.2d 1118.

■ The trial court gave the following instructions:

*No. 14:*

"Under the law of the State of Indiana, the general rule is that rights and obligations of parties are fixed and determined by the written contract which they enter into. Such a written contract can be modified by oral promises only when there is new and additional consideration.

New consideration is an act or promise which is offered so another party will enter into an agreement or modification of an existing contract, which is new and different from the performance required by the original contract.

Therefore, if you should find from a fair preponderance of the evidence that

Thatcher-Holzmann did not provide anything more than what they contracted to provide under the contract with Calumet Trucking Company, they then cannot recover any additional monies over and above those presently provided in said contract."

*No. 15:*

"A contract or modification of a written contract can be implied from the acts or conduct of the parties; however, the party seeking recovery under such contract must demonstrate a benefit rendered to the other party at the express or implied request of such other party."

*No. 16:*

"Where there is an agreement that compensation is to be paid but the price is not fixed, the party furnishing services and materials in performance of the contract is entitled to the reasonable value thereof."

*No. 17:*

"If a contract provides for specific methods under which additions, alterations, changes, extras, and extra work orders are to be approved and authorized, then, any testimony concerning other methods of handling additions, alterations, extras, changes or extra work orders in the trade, cannot be considered a part of the contract and will not relieve the plaintiffs of their obligation to comply with the written provisions of said contract unless you find from a fair preponderance of the evidence that there was an oral modification of said contract as has been defined in these instructions."

*No. 19:*

"If you find for the plaintiff, Thatcher-Holzmann, a joint venture, on the question of liability, you must determine the amount of money which will fairly compensate Thatcher-Holzmann for those elements of damage which were proved by the evidence to have resulted from the

---

**4.** In its brief Thatcher-Holzmann complains that the court's instruction No. 15 was confusing and a misstatement of the law. We note that this instruction, altered only so as to apply to modifications of written contracts, was an instruction tendered by Thatcher-Holzmann.

wrongful acts or omissions of the agents of the Bihlman partnership, Calumet Trucking Company. You may consider:

1. The amount due Thatcher-Holzmann for the test cells, if anything; and

2. The reasonable value of extra labor, expenses and materials, if any, caused by the change in specifications as contained in supplement 4.

You are to determine whether these elements of damage have been proved by a consideration of the evidence relating to damages, and your verdict must be based on that evidence."

The substance of Thatcher-Holzmann's tendered instructions was covered by the instructions given to the jury.

■ Thatcher-Holzmann objects to the trial court's refusal to give its tendered instruction number 2.[5] This instruction attempts to hold Calumet liable for extra work due to specification changes made by the design engineers who were hired by NIPSCO, a non-party. Thatcher-Holzmann's reliance on *Connersville Country Club, supra* is again inapposite. We find no authority to support this instruction and Thatcher-Holzmann fails to cite cogent authority for this issue. We believe the instruction is an incorrect statement of the law[6] and, as such, was properly refused by the trial court.

Thatcher-Holzmann claims the trial court erred in refusing to instruct the jury on the issue of reliance upon soil data furnished by Calumet. Because we found the trial court correctly granted judgment on the evidence, thereby removing this issue from the jury, we find no error in the refusal to instruct the jury on this issue.

■ Thatcher-Holzmann claims the trial court erred in failing to give its tendered instruction number 11, which stated:

"The unexplained failure of a party to appear for trial and testify concerning facts peculiarly within his or her knowledge may give rise to an inference that had she or he testified, the testimony would have been unfavorable to that party's cause; in this case defendants Ralph A. Bihlman, John B. Bihlman, and Mary Agnes Perryman, three of the four partners of Calumet Trucking Company, have all failed to appear and testify."

Thatcher-Holzmann argues that the three defendants who did not testify were partners of Calumet and therefore should have information regarding their decision not to pay Thatcher-Holzmann for extra work. One partner, David Bihlman, testified at trial.

As noted in *Chrysler Corp. v. Alumbaugh* (1976), 168 Ind.App. 363, 342 N.E.2d 908, *modified on other grounds,* 168 Ind. App. 363, 348 N.E.2d 654, various legitimate reasons may exist for failing to call a witness, e.g. the testimony would be merely cumulative, independent grounds for lack of credibility exist, and failure of the witness to perceive that which he could have observed. In addition we rejected "casual acceptance" of "missing witness" instructions which should be used only when the facts in evidence uniquely require their application. Our research has discovered only one case where the use of the instruction was upheld when applied to non-testifying parties who were partners in a business. In *King Construction Co. v. Flores* (Tex.Civ.App.1962), 359 S.W.2d 919 the plaintiff established a prima facie case showing authorization by the partnership to rent equipment and materials furnished by the plaintiff. The court of appeals found it significant that *none* of the partners testified to deny it. However, the situation here is distinguishable because

---

5. "You are instructed that if the project engineer who directed the work Thatcher-Holzmann was to do made significant changes in the specifications by which Thatcher-Holzmann was compelled to do its work under the contract, and if those changes in specifications caused Thatcher-Holzmann extra work and expenses, then

Thatcher-Holzmann can recover from the defendants for that extra work and expenses."

6. *Accord Doyle & Russell, Inc. v. Welch Pile Driving Corp.* (1973), 213 Va. 698, 194 S.E.2d 719; *W. Wright, Inc. v. Korshoj Corp.* (1977), 197 Neb. 692, 250 N.W.2d 894.

one partner testified fully regarding the issue of payment for extra work. Thatcher-Holzmann merely speculates that the other partners might know something further about the decision. Without showing that these people possessed particular knowledge or that some other justification for the instruction exists, we believe the trial court did not err in refusing the instruction.

█ Finally, Thatcher-Holzmann maintains that the trial court erred in refusing its tendered instruction number 14, which read:

"The unexplained failure of Calumet Trucking to produce its agreement with N.I.P.S.CO. may give rise to an inference that the terms of such contract may have been unfavorable to Calumet Trucking. (R. 196)."

The record shows that the trial court rejected Thatcher-Holzmann's attempt to admit the contract between NIPSCO and Calumet into evidence. The trial court based its decision in part on the fact it was a contract between Calumet and a non-party. Under these circumstances, we fail to see how Thatcher-Holzmann is entitled to an instruction which would allow the jury to draw an adverse inference from the fact Calumet did not introduce a document which the trial court ruled inadmissible.[7] We find no error in the trial court's refusal.

Affirmed.

STATON, P.J., and HOFFMAN, J., concur.

---

7. Thatcher-Holzmann did not allege error in the trial court's ruling on the contract's inadmissi-     bility.